Our final case for today is Richardson v. Griffin, and we'll begin with Ms. Dawson. Chief Judge Wood, and may it please the Court, my name is Ilana Nightingale-Dawson, and I am here on behalf of the petitioner, Mr. Christopher Richardson. In 2011, Mr. Richardson stood trial in Indiana. During his less than three-day trial, five witnesses were called to the stand. The jury, however, heard from additional witnesses, eyewitnesses to the crime, who said that Chris did it. The jury heard this testimony through the testimony of Detective Art Esplanade. Ms. Nightingale-Dawson So let me ask you this question. I mean, there's a lot, it seems to me, that went wrong at this trial, but we're finally here on habeas corpus, and what I keep struggling with is the fact that Mr. Mobley had known Mr. Richardson for a year or so, maybe a little more than a year, but let's say a year, and Mr. Mobley does identify Richardson without any hesitation. He's shot in the leg at point blank by somebody, he says, Mr. Richardson, and so even applying the Brecht against Abrahamson standard, Chapman, whatever standard is out there, why wouldn't these various errors with respect to the Confrontation Clause wind up being harmless, as the Indiana courts thought, even if they didn't express their conclusion in quite the right language? Ms. Nightingale-Dawson Yes, Your Honor, a few different reasons. First, it is clear in this case that Mr. Mobley's credibility was not a given, and the prosecutor addressed it on numerous occasions during closing argument. In fact, he was extremely intoxicated when the shooting took place. The hospital diagnosed him with acute alcohol intoxication at the time of his admission. He said that when he was shot, he was confronted, for example, with the discrepancies in his deposition testimony about what time of day the shooting occurred, and he said that he was confused given what happened. His testimony also conflicted with one of the state's other key witnesses, Ms. Strong. Their testimony was inconsistent as to the number of people that were present at the time of the shooting. So, for example, Ms. Strong testified that there were three people present, and Mr. Mobley testified that there were only two. Their testimony was inconsistent as to the direction of the suspect's car. Mr. Mobley said that it was facing north, and Ms. Strong, as well as Ms. Miller, said it was facing south. And the only disinterested witness that testified as to what was going on in that was Ms. Strong. She said that she could, that she got a good look. She was the only witness who said she got a good look at what occurred. Ms. Miller said she didn't, in addition to Mr. Mobley. Mr. Mobley did identify Mr. Richardson, but Ms. Strong did not. And on two separate occasions, the prosecutor asked her whether or not she saw who she thought it was in the courtroom, and could she identify, and she said no. And so, to be sure, there was sufficient evidence. But the question here is whether or not the problematic evidence itself had an effect on the jury, a substantial and injurious effect on direct. And so it's not a question of whether or not Mr. Mobley's testimony standing alone was enough to allow the jury to convict, but whether or not in this particular trial, the erroneously admitted evidence, that is, eyewitness accounts, in the words of the prosecutor herself, had an effect on this jury. And key also to this analysis is how the prosecutor chose to use this evidence during her closing argument. If Mr. Mobley's credibility and his identification was so definitive and so sure for the prosecutor, there was no need for her, on three separate occasions, to tell the jury that there was this additional evidence, and in fact, remind the jury that, as to credibility, it's not just Chris. In her final words in the rebuttal, she says, there are other witnesses who saw him do it. Okay, so now let me ask you a second question. We have the direct testimony of Escona. We've got the cross. We've got the redirect. So walk me through that. During the direct, which is certainly not any time when the defense is inviting any error, during the direct, Richardson's name already comes out, doesn't it? Correct. Okay. So Escona says he speaks to Holden, he finds Chris's name, and so the name is out there. So what the state is arguing is that so much is said on cross, it sounds sort of like a waiver argument to me, but at least a harmless argument that if Richardson's name is coming out on cross, there really isn't anything left to say, error is invited, whatever you want to describe it as. And then in redirect, of course, the prosecution follows up on what's said on cross. So what do we do about that cross examination? Why does that not also stand in the way of relief? Yes, Your Honor, a few responses to that. First, it's important to note that what came out on cross was not, did not, the same amount of information did not come out on cross as came out on both direct and redirect. So on cross, if you look at the actual transcript of what came out on cross, Your Honors, and in this I would draw your attention to A63 and A64 in the appendix, we see that the only things that come out on cross is the fact that the questions that Detective Ascona asked of Mr. Mobley in the hospital was the name Chris was included because of statement by Lazarus Holden and the person who phoned in. On direct, however, we hear that there were other sources, sources in the plural, that indeed identify the shooter. We also only learn on direct and redirect that it is eyewitnesses to the crime. On redirect, there are a number of different exchanges and this occurs at A66 through A68 where we hear that immediately the day of the shooting, the detective knows from sources that were present. That never comes out on redirect. So it is only on direct and redirect that we know in fact that these are eyewitnesses to the crime who are identifying Mr. Richardson as the shooter. In addition, and I agree, Your Honor, that there is a question of waiver and I don't want to speak to cases that we didn't cite, but there are, when you're talking about waiver, we did point out to Your Honor in our reply brief that you have to have a knowing and intentional waiver. And so to say that what happened on cross was a waiver is belied by the record for two reasons. A, we would maintain, as just noted, what came out on direct and redirect was broader. B, Mr. Richardson's counsel objected to the use of these, this evidence during closing by the prosecutor and the judge overruled that objection. And there's just simply no, the evidence, if you read the transcript in this case, it was quite clear in our view that Mr. Richardson and his counsel never intended to waive his right. And in fact, if you read the exchange. Well, how are they supposed to respond? And maybe this is a question for your opponent, but once his name has come out on the direct, isn't Mr. Richardson in a very difficult position anyway, even for cross? You're absolutely right. And we make that point in our reply brief as well, which is that it simply cannot be the case that if the government or the state violates the confrontation clause on direct, that the defendant's hands are tied and he must either remain silent as to that evidence on cross or forgo his confrontation clause rights in order to address the very error that occurred and simply hope that on subsequent review, his conviction will be overturned. And we maintain that is not the case state of the law. And that, in fact, what happened here was that what came out on direct and redirect in closing shows. We also maintain that the government's position that this came in for the course of the investigation and to explain the officer's decisions in this is not supported by the record. If for no other reason than if you look at direct, this court said in Jones at page 1042 footnote two, that you look to the objective indicia. And on direct, if this was really coming in as the prosecutor maintained to explain why Mr. Richardson's photo was in the lineup, there was no need for this third inquiry. So why did that need explaining anyway? We would maintain that it did not. And we did point that out as well, that in this case, there were no allegations of police and propriety. There was no suggestion that they were trying to frame Mr. Richardson. And as this court made clear in Jones, the course of investigation exception is supposed to be incredibly narrow and often does not need to be applied at all. And this we would maintain as one of those cases. I'd like to reserve the remainder of my time. All right. Thank you. Mr. Drum. May it please the court. Even if Richardson could show a confrontation clause violation, any error was harmless because the evidence was cumulative and the state's case was strong. This is a terrible record. I actually found the police officers' behavior at the hospital just stunning. Like, can you show me Chris Richardson's picture? Not is the picture of the shooter here? Of course he could show Chris Richardson's picture. He'd known him for a year. And bringing up the name on direct under the, for whatever reason, and using it as substantive corroborating evidence, it's a terrible record. At the hospital, Your Honor, Mobley identified Chris as the shooter before Detective Vascona asked him any questions specifically about Chris Richardson. Well, but when he's showing the photographs, he doesn't say, you know, point to the shooter. He says, point to Chris Richardson. That's correct, Your Honor. But Mobley had already- Which is terrible. That's not any kind of line up. Well, Mobley had already provided his version of events before the officer showed Mobley the photograph. But you've deprived it of being any kind of cross-corroboration. I'm sorry, Your Honor? By asking the question that way, the pointing to the photograph was completely useless. It was tainted. I don't think so, Your Honor, because Mobley had already said that Chris was the man who shot him. And then, and then only after that did the officer provide the, the written questionnaire, the statements in which Richardson's name was included. And then he showed him the photograph and had him identify Chris Richardson. He said, show me Chris. What do we do with all these jury questions? The jury's obviously extremely interested in the Holden account, this missing, you know, guy who vanished into thin air account. And they're asking the very kinds of questions that would have been asked on direct and cross-examination. They're clearly using it for the truth, none of this baloney about course of investigation, which we've disapproved of. And I don't see how it comes in here. As far as the jury questions, Your Honor, only one juror asked questions specifically about Holden. And he asked four questions that showed that the jury wasn't, at least that juror, wasn't even sure about what Holden said to the officer. Well, but what he's, the questions he's asking, though, have to do with how reliable is Holden? Did he live in the neighborhood? Did he, you know, did he see things? It's, again, I mean, it's just one more piece of the puzzle, reason to feel no confidence in this ruling, in this verdict. The questions that the juror asked, Your Honor, were, did Holden give a statement? Was he at the scene? Exactly. I mean, I find those, those are the kinds of questions that would lead one to decide how reliable the account was. How do you respond to the argument that the statements that were elicited on cross were not for the truth of the matter, and that, therefore, the prosecutor's later questions on redirect and statements, those statements and closing arguments, were different in kind? If the statements were at all prejudicial to Richardson, the reason they were prejudicial is because other sources said that Richardson was the shooter. And so if the statements had any prejudicial value at all, then the statements on cross examination had the same prejudicial value as the statements on direct and redirect examination. And it is our position that the state didn't offer those statements on direct and redirect to prove the truth of the matter assertive. The state offered those statements to show why Detective Ascona included Richardson's photograph in the array. Why did that need to be shown? I'm absolutely baffled at this, at this rationale, because it seems to me the police present an array and maybe it has a picture of a suspect and maybe not, you know, sometimes I don't know why the witness needs to know or the jury needs to know why was Richardson's picture in the group. It's highly prejudicial and practically zero probative value for anything legitimate. It was necessary to show that there was a good reason. Why do you have to show that? Well, you're saying that, but I understand you say that in your brief, too, but I don't understand how that assists in proving the crime. I don't see how it assists in proving the identification. If the witness, if the victim says, yep, there's the picture of the guy who shot me, you know, that's fine. It doesn't matter to the witness why the police happened to put that picture in the array. It mattered in this case, Your Honor, because one of Richardson's defenses was that the police had fed the name Chris Richardson to Mobley. So it was necessary for the state to offer this evidence to show why Detective Escona was asking specifically about Richardson so that it could rebut what it could assume would be one of Richardson's theories of defense, that the officers had fed that information to Mobley. I don't see that at all. I mean, this is, we have the earlier bit in the afternoon, the argument about the argument, so to speak, take your argument away from my front porch. And I just don't see how sneaking Richardson's name in, you could do that in every case. It would really eliminate a lot of work on the part of the state, that's for sure, because you could just get the suspect's name right in there through hearsay and ignore the confrontation clause, but that's not the way it's done. Your Honor, we know that there is a course of investigation exception to the hearsay rule. But we've said it's very narrow and I don't see that the criteria are met here. It's narrow in the sense that the statements must be brief and they must bridge gaps in the testimony. That's not the only thing we've talked about, though. We've said there has to be some reason to make the way the investigation was conducted relevant. Otherwise, you could put in the course of the investigation, every hearsay lead, the police, have every detail, and that's not what the confrontation clause permits. Even if there were a hearsay violation here, Your Honor, that would only go to one question. The next question would be, did the Indiana Court of Appeals apply a standard that was contrary to or an unreasonable application of Chapman? It's not a question that they didn't. The court didn't use the same language that the Supreme Court used in Chapman, but that's okay. But what worries me, yes, they don't. That's correct. And so if they had simply rephrased Chapman in a way that everybody could understand was a synonym of the way the Supreme Court did, we've many times deferred to state court decisions. But the Indiana Court of Appeals does not do that, actually. It makes it sound much more like sufficiency of the evidence, where they say, I'm not going to find it right away, but they say basically there was sufficient evidence to, this is sufficient evidence to render the admission of testimony regarding non-testifying witnesses harmless. That's how they wrap up that section. That's correct, Your Honor. That's how they concluded their opinion, and that was in reference to the standard that they'd already laid out. And this is the standard that they laid out. The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt, such that there is no substantial likelihood that the questioned evidence contributed to the conviction. And that's what worries me. Substantial likelihood does not necessarily say to me harmless beyond a reasonable doubt. Substantial likelihood sounds like a much lighter standard. It's certainly a different standard, Your Honor. And unconstitutionally lighter. Well, it's Richardson's burden to show that they applied a standard that contradicts the standard from Chapman. Well, and I'm, we're talking about the same thing. There's no substantial likelihood doesn't sound to me like the standard the Supreme Court has imposed. I agree that it's different, Your Honor. But it's not mutually opposed or diametrically different or opposite to the standard that the Court applied in Chapman. I don't see, but if harmless beyond a reasonable doubt requires this showing, and substantial likelihood only requires that showing, we have a problem, don't we? If Richardson could show that it was contrary to Chapman, then yes. Then the next question would be to go on to a De Novo review of whether there was indeed a confrontation clause violation. And even then, Richardson has to show that he was actually prejudiced by these statements, which he can't do based on the strengths, the strength of the state's case. Mobley had known Richardson for at least a year. He was able to identify him as the shooter because he shot him. What about his blood alcohol content, his impairment, his inconsistent statements? You think there's no way that a jury might not have been skeptical of his identification? Mobley testified that he had a nice buzz, but he was not so drunk that he wouldn't recognize who shot him. And the jury had to believe that? They didn't have to, Your Honor. No. Only they had to believe his identification. Thank you. All right. Thank you. Oh. The hospital records deny that. They show a high BAC, Your Honor. Well, why deny that? They show a high BAC, but I'm not sure how much blood he had lost based on the gunshot going to his leg, so I can't speak specifically to how that would have impacted his blood alcohol content. If there are no further questions, we ask that this Court affirm the district court. Thank you. Okay. Fine. Anything further, Ms. Johnson? Just a few points, Your Honor. Thank you. First, we'd like to point out that contrary to the State's position, Detective Eskoton's testimony was actually that he, in fact, provided the questions with Chris's name to Mr. Mobley prior to questioning him. This is located at Trial Transcript, page 234, and page 234 is in Volume 3. And he says, the question is, with respect to Exhibit A, and those are the questions, would it be fair to say that you went in with those five pages of questions that are blank? That is correct. And then the question is, and you show these to Mr. Mobley before you ever even talked to him? Answer, yes. You can find those questions at Record on Appeal, starting at page 220. And as noted in our briefing, they repeatedly contain the name Chris. Second, as to the jury questions, if you look at the actual jury questions at Trial Transcript 273 and 276, there's nothing in the record, so far as we can tell, that suggests that it was only one juror asking the question. And third, as to actual prejudice, this Court need only conduct the actual prejudice analysis, because under Brecht, that analysis itself, the question of Chapman harmlessness is subsumed by the Brecht analysis. And we would point out that the record is replete with evidence that the jury could have questioned the credibility of Mobley. And that is evidenced by the prosecutor's choice to repeatedly tell the jury that there was corroborating evidence in the record. There are no further questions we ask that the Court reverse. Thank you very much. And thank you as well. I believe you took this as an appointment from the Court, and we appreciate your help very much. Thank you. And thanks as well to the State. We will take this case under advisement, and the Court will be in recess.